# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CARLOS BLACK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. 12-0413-CG-B** |
| ) | |
| **CITY OF MOBILE, <u>et</u> <u>al</u>.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>ORDER</u>

This matter is before the court on the motions for summary of judgment of the defendants Durwin Martin ("Martin") (Doc. 43), Police Chief Michael Williams ("Chief Williams") and the City of Mobile (Doc. 39), plaintiff Carlos Black's ("Black") response (Doc. 48), and the defendants' replies. (Docs. 52, 54).

On May 22, 2012, Black filed a complaint against Martin, Chief Williams and the City of Mobile in the Circuit Court of Mobile County, Alabama, alleging (1) a state law claim and 42 U.S.C. § 1983 against Martin, Chief Williams and the City of Mobile for assault; (2) a state law claim and 42 U.S.C. § 1983 claim against Martin for unlawful arrest; (3) a state law and a 42 U.S.C. § 1983 claim against Martin for excessive force; and (4) a claim against the City of Mobile and Chief Williams pursuant to 42 U.S.C. § 1983 and Alabama state law for the failure to train, monitor or supervise. (Doc. 2-

1)

On June 21, 2012, Chief Williams and the City of Mobile removed the case to this court. (Doc. 1). Subsequently, on May 21, 2013, Chief Williams and the City of Mobile filed a motion for summary judgment and Martin did the same. (Docs. 41, 44). For reasons stated below, Chief Williams' and the City of Mobile's motion for summary judgment is due to be **GRANTED** and Martin's motion for summary judgment is due to be **DENIED**.

## I. FACTUAL BACKGROUND

For summary judgment purposes, the court's analysis must begin with a description of the facts in the light most favorable to Black, who is the non-moving party. See Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).

Black filed this lawsuit against former City of Mobile Police Officer Martin, the City of Mobile and Chief Williams as a result of his arrest on May 22, 2010 at the Howard Johnson motel ("the motel") located at 2132 Government Boulevard in Mobile, Alabama. (Doc. 48).

On the date of the incident, Black was working at the motel as a security guard. (Doc. 46-1 at 109). The motel hired Black to eliminate multiple problems including drug transactions, fights and theft. Id. at 114. Black had been living at the hotel since he was hired in October or November of 2009. Id. at 109-110. Black lived in room 210, which was located on the second floor of the motel across from the stairwell. Id. at 112. Black's girlfriend at the

time, Deidra Doyle ("Deidra") and her son, moved in with Black around February or March of 2010.[1]

On May 22, 2010, a guest of the motel named Carletha Palmer contacted the Mobile Police Department to report the possible theft of her wallet from her motel room. (Doc. 45-1 at 2). An officer with the Mobile Police Department handled the report over the phone. Id.

Mobile Police Department received a second call regarding the theft of Ms. Palmer's wallet later that day. Id. City of Mobile Police Officers Stephen O'Daniel ("O'Daniel") and Martin were dispatched to the motel to respond to the call. (Doc. 40-2, ¶ 3; Doc. 45-1 at 2). Martin and O'Daniel arrived at the motel at approximately 1:30 a.m. (Doc 40-2, ¶ 3). Ms. Palmer's room was located upstairs about four rooms down from Black's room. (Doc. 46-1 at 181-182). Black was in Ms. Palmer's room arguing with Ms. Palmer's boyfriend, but he and another security guard working at the motel left immediately after the officers arrived. (Doc. 40-2, ¶ 3; Doc. 45-1 at 2). Ms. Palmer then informed Martin and O'Daniel that she suspected her boyfriend, Eddie Bailey ("Bailey"), took her wallet. Id. Bailey denied taking the wallet. Id. Ms. Palmer did not want to file a police report, but requested that Bailey leave the room. (Doc. 45-1 at 2). At that point, Bailey left the motel room and the officers left the premises. (Doc. 40-2, ¶ 3; Doc. 45-1 at 2).

Ms. Palmer contacted the police department a third time on May 22, 2010, and Officer O'Daniel and Martin were once again dispatched to the

---

[1] Carlos Black married Deidra Doyle on April 13, 2010. (Doc. 46-1 at 35-36, 113-114).

motel. (Doc. 40-2, ¶ 4; Doc. 45-1 at 2). The officers arrived at the motel at approximately 3:30 a.m. (Doc. 40-2, ¶ 4). As they were walking to Ms. Palmer's room, the officers testified that Black came into the hallway from another room and told Martin that he needed to leave the motel because he was not allowed to be there. (Doc. 40-2, ¶ 4; Doc. 45-1 at 2-3). The officers claim they ignored Black's comments and continued to Ms. Palmer's room. Id.

Ms. Palmer notified the officers that Bailey had seen Black take items from her wallet and discard the wallet in the parking lot. (Doc. 40-2, ¶ 5; Doc. 45-1 at 3). When Ms. Palmer confronted Black, he said that Bailey had stolen the wallet and bought drinks in the motel bar with her credit card. Id. Ms. Palmer also explained that Black described items inside her wallet that only she would know about. Id. The officers testified that they then asked Ms. Palmer to come downstairs with them to let the motel's manager know that Black had been implicated in the theft of a motel guest's property. Id.

The officers and Ms. Palmer claim that on their way downstairs Black came out into the hall again yelling at Martin that he was not allowed on the property. (Doc. 40-2, ¶ 6; Doc. 45-1 at 3). Officer O'Daniel told Black to return to his room. Id. Black began walking towards Martin becoming louder and shouting obscenities. Id. Deidra also came outside of the room and began yelling at Martin. Id. Black had woken her up to let her know Martin was at the motel. Id.

Officer O'Daniel testified that he again told Black to go back inside his

motel room or he would be arrested for disorderly conduct. (Doc. 40-2, ¶ 6; Doc. 45-1 at 3). Black and Deidra continued to yell at Martin, and Black moved towards Martin in an aggressive manner. Id. Martin testified that he told Black he was under arrest for disorderly conduct. (Doc. 40-2, ¶ 7; Doc. 45-1 at 3). The officers stated that when they tried to place Black under arrest, Deidra intervened in attempt to prevent the arrest. Id. Officer O'Daniel then moved Deidra out of the way. (Doc. 45-1 at 3). The officers testified that Martin grabbed Black's arm and applied one handcuff to his wrist. (Doc. 40-2, ¶ 7; Doc. 45-1 at 3). The officers claim that Black told Martin to get his hands off of him while spinning around to punch Martin in the face. The officers state that Martin then began returning blows in self-defense. (Doc. 40-2, ¶ 7). Officer O'Daniel testified that he fired his taser at Black, but the probes did not hit him. (Doc. 40-2, ¶ 7; Doc. 40-1 at 193-194; Doc. 45-1 at 4).

Black disputes that he was yelling at Martin or under arrest before the fight between him and Martin began. (Doc. 51-1 at 206-208). Black testified that he was heading down to the motel bar to further investigate the theft of Ms. Palmer's wallet when Martin grabbed his collar as he approached the stairwell. (Doc. 51-1 at 191-192). Black stated that Deidra attempted to intervene in the altercation, but Martin pushed Deidra away yelling, "move back, bitch." (Doc. 51-2 at 277-278; Doc. 51-3 at 83). Deidra was pregnant at the time of the incident. (Doc. 51-2 at 280; Doc. 51-3 at 118). Black testified

that Martin began punching him while Officer O'Daniel stood back and allowed the fight to continue. (Doc. 51-1 at 193, 278-279; Doc. 51-3 at 83-85, 118-199).

At this point in the narrative, all parties agree that Black kicked Martin in the midsection knocking him backwards down the stairwell. (Doc. 40-1 at 192). After falling down about eight steps, Martin caught himself. Id. at 194. Martin attempted to fire his taser at Black, but it had no effect. (Doc. 40-2, ¶ 8). Martin testified that Black then turned around and began running down the hallway. (Doc 40-1 at 197; Doc. 40-2, ¶ 8). The officers chased after Black, but Black grabbed Martin around his gun belt. (Doc. 40-1 at 197). Black testified that he slung Martin on the ground and was on top of Martin exchanging blows. (Doc. 40-1 at 197). Black would not let Martin get up. Id. Officer O'Daniel deployed his taser in touch-stun mode, but Black continued to resist. (Doc. 40-2, ¶ 8). Martin testified that at this point he touch tased Black to get him under control. (Doc. 45-1 at 4).

Black was handcuffed and placed under arrest for disorderly conduct, public intoxication, assault second degree and resisting arrest. (Doc. 45-1 at 6). Black testified that while he was handcuffed face-down on the ground, Martin kicked him in the head. (Doc. 51-2 at 282; Doc. 51-3 at 84, 120-121). Officer O'Daniel and Martin deny this allegation. Black also claims his shoulder was injured when the officers picked him up by his handcuffs and him dragged downstairs. (Doc. 51-2 at 283-284; Doc. 51-3 at 123-124).

Firemedics came to the scene and treated Black for a cut on his head and near his neck. (Doc. 45-1 at 4).

Sergeant Lee Peirce with the City of Mobile Police Department, who was supervisor over Officer O'Daniel and Martin at the time, responded to the scene to investigate the incident. (Doc. 40-4 at 2-3).

A few days following the incident, Beatrice Hunt ("Hunt"), who was Martin's ex-girlfriend and a mutual acquaintance with Black, went to speak with Martin about what happened between him and Black at the motel. (Doc. 49-2, ¶ 7). Martin stated that his fellow police officers "had his back" with regard to the incident. Id. at ¶ 8. Martin also told Hunt to stay out of the matter or he would have her arrested on a warrant issued for her on an outstanding traffic ticket. Id. at ¶ 9.

Black contends he first met Martin in 2006 while Black was working as a bail bondsman and Martin was working at the warrants office. (Doc. 40-1 at 59-60). Black claims that he did not know Martin at the time, but that Martin gave him a hard time when he requested information from the warrants office. Id. at 61-63. The only time Black recalls speaking to Martin on the telephone was in 2006 when Martin was working at the warrant office. Id. at 100-101.

Martin and Deidra had a relationship prior to her marriage with Black. (Doc. 40-3 at 68-73). Deidra claims that she and Martin never actually dated, but that Martin wanted to become romantically involved. Id.

About three months before the incident, Martin sent Black Facebook messages under the false account name Angel Jones. (Doc. 46-1 at 97-99). Black contends that Martin was attempting to use his response to those messages as evidence that he was unfaithful, so that Deidra would leave him. Id. On March 26, 2010, Martin sent the following message to Deidra on Facebook:

> i c u added carlos black and not me,u told me u couldnt stand him, u hate me that much, ok fine I am still in love with u, but u don't care, I understand u need your bills payed and I couldn't help u,but 2gether we couldve made it. [sic]

(Doc. 49-6). On the night of March 28, 2010 and early morning of March 29, 2010, Martin made a series of telephone calls to Deidra. (Doc. 51-2 at 227-228; Doc. 51-3 at 37-39; Doc. 49-5). Deidra claims she alerted the Mobile Police Department that one of its officers had been harassing her via telephone calls. (Doc. 51-3 at 45-49). After the string of phone calls, Martin sent the following Facebook message to Deidra:

> you hurt me,,I knew that you told him something,,,,I hope he did what he did to you before, I knew you did save up all that money, I know someone help you,,I knew that charger was over there 4 u,,carlos drives it,u already been fuckin him,,,I seen it over there b4,he has been tring to get with this fake girl from the beginning…he told u something about me,,instead of u askin me u believed him,,someone know for lying,,,he probally got his buddies 2 lie 4 him. I though we would be 2gether after what happened but have done something I never guessed u wouldve,,,I was good 2 u,,I even gave u money on my bday,,u made me happy,,,I believed I had a chance,,,but I guess I don't,,how can u go 2 some1 that don't love u,,u just wanted sex with him,,,he gives u money,,,coll that is y I asked for my ring back to move on,,all u had 2 do was tell me,,instead of acting like u cared or protecting yourself, when u told me u didnt tell

him anything I said,,God don't like ugly,,,I am going to wish all kinds of bad luck on you,,,unless u tell me y ,,,and tell me u ri sorry for hurting my feelings,,,I m not going 2 mess with carlos,,I m sure he ll do that hisself I hope u r with him when he does, u got me looking like a jack ass cause carlos told u something about me y didnt u tell me what he said,, u told him what I said,,,u let him speak his mind and tell his side,,,and still tring 2 get another girl whie he is seeing u,,,good call on your part, like I said I will pray for the most bad luck 2 happen 2 u, cause u used me on my bday,,,u shouldnt have came or told me Friday when I askd if we could b 2gether,,u shouldve said no leave me alone,,,I even ask if u had some1 and u said no,,,but its cool,,,,this is y I was taking things back,,,this is y I felt like I did,,,carlos bought your truck cool thats what u wanted,he got everything u always wantd, he got u a bed,,,cool that's what u wantd,,,he got everything u always wantd,,,and he takes jydn to the park a lovely family but he still tring 2 get him some on the side,,,I want 2 know y and 4 u tell me u r sorry,,,,by the way,,,,his fake face book girlfriends login is angelprettygirl@yahoo.com  pass word is willsee [sic]

(Doc. 49-6).

Around this same time, Martin went the motel in response to a call during his routine police patrol. (Doc. 46 at 134). Black testified that after Martin and he exchanged words, Martin threatened to arrest him. (Doc. 51-2 at 124-125). Black states that at that this point David Larsen, the motel manager, asked for Martin's supervisor to be present at the scene and told Martin that he was no longer allowed to be on the motel premises. (Doc. 51-2 at 110, 124-125, 142- 144). Black claims that this is the only time he personally saw Martin before to the incident. (Doc. 51-2 at 103-104).

Shortly thereafter, Martin ran into Hunt. (Doc. 48, at 3-4). Martin warned Hunt to stay away from Black and that he wanted Deidra back. (Doc. 49-2, ¶ 3). Martin also told Hunt he would make sure Black went to jail. Id.

at ¶ 4.

Black testified he reported the problems he was having with Martin to a sergeant at the First Precinct where his statement was taken. (Doc. 51-2 at 151-152; 254-255). Black also claims to have spoken with Internal Affairs about Martin. <u>Id.</u> at 153-154.

Officers O'Daniel and Martin both completed their minimum standard training through Mobile Police Academy and were sworn law enforcement officers at the time of the incident. (Doc. 40-2, ¶ 2; Doc. 40-5, ¶ 3; Doc. 45-1 at 1). Both officers maintained their status as sworn law enforcement officers since finishing the academy by complying with the requirements for continuing educational training each year. <u>Id.</u> The officers received training from the Mobile Police Academy on making arrests and the use of force when arresting and detaining individuals. <u>Id.</u>

Chief Williams was not involved in the incident with Black on May 22, 2010 and did not respond to the scene. (Doc. 40-6, ¶ 2). He has no knowledge of any prior interactions between Martin and Black. (Doc. 40-6, ¶ 3).

A judge in state court bound Black over to a grand jury for the assault second degree charge because he admitted to hitting a police officer. (Doc. 46 at 340, 253-254). The grand jury subsequently no-billed the charge.

## II.      SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade,

178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Hinesville Bank v. Pony Exp. Courier Corp., 868 F.2d 1532, 1535 (11th Cir. 1989) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(a), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d

994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation and citation omitted).

### III.    LEGAL ANALYSIS

Black's complaint asserts four causes of action pursuant to state and federal law. (Doc. 2-1). Count One alleges that Martin assaulted and intentionally and willfully caused personal injury to Black. Id. at ¶ 8. Count One also asserts that Chief Williams was deliberately indifferent to the substantial risk of harm Martin posed to Black as well as that the City of Mobile and Chief Williams failed to take appropriate measures to prevent incident. Id. at ¶ 9-10. Count Two asserts a claim of unlawful arrest against Martin. Id. at ¶ 14. Count Three asserts an excessive force claim against Martin. Id. at ¶ 19. Lastly, Count Four asserts a claim for failing to train, supervise or monitor against the City of Mobile and Chief Williams. Id. at 21.

### A.    Martin's liability under § 1983

Martin argues that he is entitled to qualified immunity for the § 1983 claims for assault, excessive force and unlawful arrest brought against him in his individual capacity. [2] "Qualified immunity protects government officials

---

[2] The complaint asserts state law and § 1983 as the basis of its assault cause of action. However, the court will consider the assault claim as excessive force when

performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Lassiter v. Alabama A & M Univ.</u>, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). Courts consider "whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were in his power to utilize." <u>Holloman ex rel. Hollman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004). Here, it is clear that Martin was acting within the scope of his discretionary authority. The incident occurred while Martin was on routine patrol as a City police officer, having been dispatched to the motel on suspicion of a stolen wallet and in the course of attempting to arrest Black. This type of law enforcement conduct satisfies the discretionary function

analyzing liability under § 1983.

element for qualified immunity purposes. <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002) (law enforcement officer clearly acts within course and scope of discretionary authority by arresting plaintiff and transporting her to jail). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." <u>Lee v. Ferraro</u>, 284 F.3d at 1194.

Under <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the "threshold question" to be determined before any other inquiry is: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. Only if the answer to that question was affirmative, may the court proceed to determine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." <u>Id.</u> The court notes that this two-part inquiry established in <u>Saucier</u> is no longer mandatory. <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S.Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). If no constitutional right was violated, the court need not inquire further. <u>Id.</u> If, however, a constitutional violation occurred, the court must then determine whether the right was clearly established. <u>Id.</u>

**1. Excessive Force**

In considering the first step of <u>Saucier's</u> two-step qualified immunity inquiry, we must determine whether the plaintiff's constitutional right to be free from excessive force was violated. The court, in making this determination, must presume that the plaintiff's version of events is true. <u>See Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002) (The threshold inquiry is "whether plaintiff's allegations, <u>if true</u>, establish a constitutional violation.") (emphasis added).

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." <u>Brown v. City of Huntsville</u>, Ala., 608 F.3d 724, 737 (11th Cir.2010) (citing <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1197 (11th Cir.2002)). However, Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 22–27, 88 S.Ct. 1868, 1880–1883 20 L.Ed.2d 889 (1968). Though some force is permitted, whether the force is reasonable relies on "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Brown</u>, 608 F.3d at 737–38 (quoting <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347 (11th Cir.2002)). Whether a constitutional violation occurred is measured by the "objective reasonableness" standard. <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1329 (11th

Cir.2008) (citing <u>Brosseau v. Haugen</u>, 543 U.S. 194, 197, 125 S.Ct. 596, 598, 160 L.Ed.2d 583 (2004)). An officer is entitled to qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situation could have believed the use of force was not excessive. <u>Graham v. Connor</u>, 490 U.S. 386, 396–397, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989); <u>Brown</u>, 608 F.3d at 738. Consequently, the Court must focus solely on the objective basis and not the officers' subjective belief. <u>Brown</u>, 608 F.3d at 738 (citing <u>Hadley</u>, 526 F.3d at 1330).

> To balance the necessity of the use of force ... against the arrestee's constitutional rights, a court must evaluate several factors, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."

**\*13** Id. (quoting <u>Vinyard</u>, 311 F.3d at 1347).

According to Black's version of events, Martin kicked Black in the head when he was lying facedown on the ground after his arrest. At this point, Black was already tased, handcuffed and subdued. Black was not an immediate threat to the safety of the officers or others, and a kick to the head was not needed to effectuate the arrest. This type of unreasonable conduct is clearly a violation of Black's Fourth Amendment right to be free from excessive force.

Martin does not address the allegation that he kicked Black in the head. Instead, Martin argues that because Black escalated the conflict by kicking Martin down the stairs and continued to resist arrest once the police

officers tackled him to the ground, the use of the taser to subdue Black does not constitute excessive force under the "calculus of reasonableness." However, this is not the conduct at issue. When looking at the facts in the light most favorable to the plaintiff, Martin's use of force was excessive at the time he allegedly kicked Black in the head. Accordingly, the court finds that summary judgment is due to be **DENIED** as to the excessive force and assault claims against Martin.

**2. Unlawful Arrest**

In Fourth Amendment terminology, an arrest is a seizure of the person, <u>California v. Hodari D.</u>, 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and the "reasonableness" of an arrest is determined by the presence or absence of probable cause for the arrest. "There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment." <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1324 (11th Cir. 1997) (citing <u>Von Stein v. Brescher</u>, 904 F.2d 572, 579 (11th Cir. 1990)). "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." <u>United States v. Jimenez</u>, 780 F.2d 975, 978 (11th Cir. 1986) (internal quotation marks and citations omitted).

"While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007). An officer is not automatically liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause. As the Supreme Court observed in Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable." Thus, even if it is determined that the officers did not in fact have probable cause, the standard to be applied is that of "[a]rguable probable cause," that is, whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[s] could have believed that probable cause existed to arrest." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (quoting Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001)). This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists. Id. The plaintiff bears the burden to "demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances." Id. Consequently, "even law enforcement officials who reasonably but mistakenly conclude that

probable cause is present are entitled to immunity." <u>Holmes v. Kucynda</u>, 321 F.3d 1069, 1079 (11th Cir. 2003) (internal quotations marks and citations omitted).

Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern. <u>Skop</u>, 485 F.3d at 1137–38. Arguable probable cause does not, however, require an arresting officer to prove every element of a crime before making an arrest, because such a requirement "would negate the concept of probable cause and transform arresting officers into prosecutors." <u>Scarbrough v. Myles</u>, 245 F.3d 1299, 1303 (11th Cir. 2001). Thus, the inquiry is "whether [the defendant] violated clearly established law in making the arrests based on the objective factors that gave rise to his probable-cause determination and not whether the arrestees' actions actually constituted a crime." <u>Id.</u> at 1303 n. 8.

In his complaint, Black only asserts that Martin "intentionally brought a false charge of assault against the Plaintiff." (Doc. 2-1 at ¶ 14). However, qualified immunity applies if the officer had arguable probable cause to arrest for any offense. <u>Brown v. City of Hunstville</u>, 608 F.3d 724, 735 (11th Cir. 2010). Here, Black was arrested for disorderly conduct, assault second degree, resisting arrest and public intoxication.[3]

---

[3] Resisting arrest could not serve as probable cause for initiating Black's arrest because the probable cause for an offense must exist before an officer makes the arrest. Martin is correct in arguing that the case cited by Black to support this contention that he has a right to resist arrest concludes by finding the common-law right to resist an arrest not based on probable case has been "virtually abolished" because today's society provides ready access to the judicial system to redress such

Alabama law defines assault second degree as:

>   (a) any person commits the crime of assault in the second degree if the person does any of the following:
>   (1) with intent to cause serious physical injury to another person he or she causes serious injury
>   …
>   (2) With the intent to prevent a peace officer, as defined in Section 26-21-60, a detention or correctional officer at any municipal county jail or state penitentiary, medical personnel, a utility worker, or a firefighter from performing a lawful duty, he or she intents to cause physical injury and he or she causes physical injury to that person…

Ala. Code §13A-6-21 (1975).

Black's argument that "Martin's personal animosity towards Plaintiff is what resulted in his civil rights being violated" fails because it is established that the arresting officer's subjective intentions, state of mind and personal motivation are irrelevant in determining whether probable cause existed for an arrest. Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006). Black's argument that the no-billing of his assault charge by a grand jury in state court

---

police misconduct. United States v. Bailey, 691 F.2d 1009, 1018 (11th Cir.1982). However, Alabama courts seem to recognize that "[w]hile an officer has the power to use a reasonable amount of force in making a lawful arrest or investigatory stop, an Alabamian has the reciprocal right to use force in resisting an unlawful arrest." Galloway v. City of Abbeville, 871 F.Supp.2d 1298, 1306 (M.D. Ala. 2012) (citing Sanders v. State, 181 Ala. 35, 61 So. 336 (1913)("an attempt unlawfully to arrest gives the person sought to be arrested a right to resist")); Telfare v. City of Huntsville, 841 So.2d 1222, 1229 (Ala. 2002) ("The law is clear that, to a limited degree, a party is justified in attempting to resist an unlawful arrest. A party may use reasonable force to extricate himself from an unlawful arrest." (internal citations omitted)). While this narrow right may exist, it is doubtful that kicking Martin down the stairs is conduct that would fall within its scope. Also, neither the defendant nor plaintiff mentioned the public intoxication charge with regards to probable cause in their summary judgment materials.

evidences that the judge erred in finding probable cause existed is also not dispositive.[4] However, the court finds that there is a dispute over genuine issues of material fact sufficient to defeat summary judgment.

Black asserts that he was not under arrest for disorderly conduct at the time Martin grabbed his collar and punched him in the chin. Black claims that he kicked Martin down the stairs in self-defense. According to Martin's version of events, he was the one acting in self-defense. Although Martin disagrees with Black's version of events, he argues that even when applying Black's rendition of events there was probable cause to arrest Black because Black escalated the altercation from de minimus force when he kicked Martin down the stairs. The court disagrees. Under Black's version of events, Martin had already pushed Black up against the wall by his collar and punched him in the jaw. Therefore, a reasonable juror could find Martin lacked arguable probable cause to make an arrest for assault if the reasonable juror finds that Black acted in self-defense.

Even if there was no arguable probable cause to arrest Black for

---

[4] Plaintiff's response in opposition to summary judgment cites to a "Sherling Affidavit" which appears to reference an affidavit of the state court judge who bound Black over to the grand jury on the assault charge. (Doc. 48 at 5). The affidavit purportedly contains information that Martin initially denied under oath knowing who Black was at the time of the incident. Id. The affidavit is not included in the record in this case and any reference to it, or what it allegedly contains, is therefore not considered by the court. Black's argument as to what his counsel observed and heard in the criminal case including the judge's purported statements that he did not believe Martin's testimony was credible is improper and unsupported by anything in the record, and is likewise not considered. Id. at 8-9.

assault second degree, Martin will still receive qualified immunity if there was arguable probable cause to arrest Black for disorderly conduct. Alabama law defines disorderly conduct as:

> A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

> (1) Engages in fighting or in violent tumultuous or threatening behavior; or
> (2) Makes unreasonable noise; or
> (3) In a public place uses abusive or obscene language or makes an obscene gesture; or
> (4) Without lawful authority, disturbs any lawful assembly or meeting of persons; or
> (5) Obstructs vehicular or pedestrian traffic, or transportation facility; or
> (6) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse.

Ala. Code § 13A-11-7 (1975).

The parties dispute the facts giving rise to Black's arrest for disorderly conduct. The officers claim that Black was under arrest for disorderly conduct when the fight between Martin and Black broke out. The officers allege that Black was under arrest because he was yelling obscenities at Martin and moving towards him in an aggressive manner. According to Black's version of events, however, he was not under arrest for disorderly conduct before Martin grabbed his collar. Black testified that he had not spoken to Martin at all that day and was just walking down to the motel bar to further investigate the stolen wallet when Martin grabbed him by the collar in the stairwell.

Because the weight apportioned to credibility of witnesses and veracity of testimony is a decision for the jury to make, summary judgment is due to be **DENIED** against Martin as to the claim of unlawful arrest pursuant to §1983.

**B. Chief Williams' liability under § 1983**

Black asserts an assault claim against Chief Williams individually under § 1983 alleging that the Chief should have known of a substantial risk of serious harm to Black, was deliberately indifferent to the same and refused to take adequate measures to prevent the incident. Black further contends that Chief Williams failed to adequately train, monitor and supervise Martin in violation of the Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution.

Supervisory officials cannot be held liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). "In order to prevail on the merits in a § 1983 action against a defendant in his individual capacity, the plaintiff generally must show that he is personally involved in acts or omissions that resulted in the constitutional deprivation. Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995). Supervisory liability can also arise under § 1983 when there is a "causal connection between the actions of the supervising official and the alleged constitutional deprivation."

Braddy v. Florida Dep't of Labor and Employment Security, 133 F.3d 797, 801-802 (11th Cir. 1998)(citing Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). The necessary causal connection "can be established when a history of widespread abuse puts the reasonable supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constituted widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Id.

Chief Williams did not personally participate in the incident made the basis of this lawsuit, nor did he have prior knowledge of the facts to put him on notice of any need to intervene prior to the incident on May 22, 2010. Furthermore, Black has not demonstrated an affirmative causal connection between Chief Williams' actions and the alleged constitutional violation by Martin.

Chief Williams is also entitled to qualified immunity under the same burden-shifting standard as used in evaluating Martin's claim for qualified immunity. Black has not challenged that Chief Williams was acting within his discretionary authority. Chief Williams is entitled to qualified immunity at this stage in the proceedings unless Black demonstrates a violation of a clearly established constitutional right. The plaintiff is required to point to a controlling case decided prior to the events made the basis of this suit, which establishes a constitutional violation under the circumstances. Vinson v.

Clarke County, Ala, 10 F.Supp.2d 12182, 1297 (S.D. Ala. 1998). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Lassiter v. Alabama A & M Uni., Bd. Of Trustees, 28 F.3d 1146, 1150 (11th Cir. 1994). Black has not cited any case demonstrating Chief Williams violated his clearly established right by failing to ensure Martin was not dispatched to calls at the motel. Thus, summary judgment is due to be **GRANTED** as to the § 1983 claims asserted against Chief Williams.

## C. City of Mobile's liability under § 1983

It is clear that § 1983 applies to municipalities and other local government entities. Monell v. Dept of Social Services of N.Y. City, 436 U.S. 658 (1978). In order to state a claim under § 1983 against the City of Mobile, the plaintiff must show that he suffered a constitutional injury and that injury was caused by an official custom or policy which can be attributed to an official policy maker of the municipality. Id. at 690. The governmental custom or policy must be the "moving force" behind the alleged constitutional violation. Id. at 694.

The plaintiff correctly recognizes that there is no respondeat superior liability under § 1983. Instead, Black argues that the City of Mobile's liability is grounded in its own culpability. Black alleges that the City of Mobile was aware of Martin's conduct because he, Diedra, and Mr. Larsen lodged

complaints with Martin's superiors at the Police Department, and that the City of Mobile failed to properly train Martin and take preventative or corrective measures.[5]

Inadequate police training can rise to the level of a policy or custom that is actionable under § 1983 in "limited circumstances." City of Canton v. Harris, 498 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "These 'limited circumstances' only exist where the municipality's training program or supervision is inadequate, this failure to train or supervise is a city policy, and that city policy results in the employees violating a citizen's constitutional rights." Id. at 389. It is only when the failure to train amounts to "deliberate indifference" that it can properly be characterized as a "policy" or "custom" necessary for § 1983 to attach. Id. at 389. To establish a "deliberate indifference" in this context, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). See Church v. City of Huntsville, 30 F.3d 1332, 1342–46 (11th Cir.1994), (holding that the plaintiffs were not likely to succeed on the merits of their failure-to-

---

[5] In discussing the liability of the City, Black also suggests that Officer O'Daniel stood by and watched as Martin kicked him in the head. While there is authority providing that an officer may be held liable for failing to take reasonable steps to protect a victim from the use of excessive force by another officer, no such allegation has been made in this case. See Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-2 (11th Cir. 1985). Martin is the only police officer involved in the arrest of Black that was named in the complaint.

train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated); see also Popham v. City of Talladega, 908 F.2d 1561, 1564–65 (11th Cir.1990) (finding no liability for failure to train when there was no pattern of incidents to put the City on notice of a need to train).

In the instant case, Black testified that when Martin responded to a call at the motel in March 2010, Martin threatened to arrest Black for interfering with his law enforcement duties. The only detail Black can recall from this encounter is that the hotel manager, David Larsen, came outside and asked to speak to Martin's supervisor. When Martin's supervisor arrived, Black claims he told him that Martin was Black's wife's ex-girlfriend and that Martin was trying to arrest him. Black also alleges that he complained to a sergeant at the police department and to Internal Affairs. These isolated events fail to show a pattern of constitutional violations or that a policy or custom of the City was the moving force behind any alleged constitutional deprivation. Furthermore, there is no evidence that shows the claimed injuries are plainly obvious consequences of the City of Mobile's training, supervising or monitoring decisions.

Black relies solely on the March 2010 encounter with Martin and his complaints regarding the same. This evidence is insufficient to establish, or even suggest, notice on the part of the City that additional training was needed in a specific area relevant to the facts of the case. Black has not put

forth any evidence that establishes an alleged inadequacy in the City's training program. Therefore, the court finds that there is no evidence that the City's alleged failure to train rises to the level of deliberate indifference necessary to constitute a policy or custom to maintain a §1983 claim.

Finally, the court also notes that Black's § 1983 claim seeks punitive damages, however, the City of Mobile is immune from any demand for punitive damages. <u>Kentucky v. Graham</u>, 473 U.S. 159, 105 S.Ct. 3099, 97 L.Ed.2d 114 (1985). Therefore, the court finds that summary judgment is due to be **GRANTED** as to Black's claims against the City of Mobile under § 1983.

## D. State law claims

Black brings state law claims for assault, unlawful arrest, and excessive force against Martin individually. Black also asserts the assault claim against Chief Williams individually and the City of Mobile, and further alleges that Chief Williams and the City of Mobile were negligent in training, monitoring and/or supervising Martin.

### 1. State law claims against Martin

Martin claims that he is entitled to qualified immunity from the state law claims asserted against him. Alabama law recognizes at least two types of immunity from suit or liability for the individual executive acts of public officers.

Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998). The first is absolute "state-agent" immunity, which is afforded to certain state constitutional officers. Id. The second type of immunity, described as "discretionary function" immunity, is not absolute and applies when a state officer or employee commits a tort while engaged in the exercise of a discretionary function. Taylor v. Shoemaker, 605 So.2d 828, 831 (Ala. 1992) (citing Sellers v. Thompson, 452 So.2d 460 (Ala. 1984).

The relevant Alabama statute establishing discretionary function immunity is Ala. Code 6-5-338(a) (1975), which reads:

> Every peace officer…who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof…shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Under the discretionary function immunity analysis, the court must first determine if Martin was performing a discretionary function when the alleged wrong occurred. Wood v. Kesler, 323 F.3d 982, 883 (11th Cir. 2003). Discretionary acts are "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Id. at 2. See also L.S.B. v. Howard, 659 So.2d 43, 44 (Ala. 1995). If the court finds that Martin was performing a discretionary function, then the burden shifts to Black to demonstrate that Martin acted in "bad faith, with malice or willfulness." See Wood v. Kesler,

323 F.3d 872, 883 (11th Cir. 2003); See also Sheth, 145 F.3d at 1238-1239.

"Acts of such a nature are not considered to be discretionary." Wright v. Wynn, 682 So.2d 1, 2 (Ala. 1996).

Here, the court finds that Martin's arrest of Black was a discretionary act for immunity purposes. Generally, arrests and attempted arrests are classified as discretionary functions. Borders v. City of Huntsville, 875 So.2d 1168, 1178 (Ala. 2003) (citing Telfare v. City of Huntsville, 841 So. 2d 1222 (Ala. 2002)).

Therefore, the burden now shifts to Black to prove that Martin acted in bad faith, with malice or willfulness in arresting him. See Wood, 323 F.3d at 883. In the arrest context, a plaintiff may satisfy his burden by, "for example, showing that the defendant had a personal ill will against the [plaintiff] and that he maliciously or in bad faith arrested him solely for purposes of harassment." Ex parte Tuscaloosa County, 796 So.2d 1100, 1107 (Ala. 2000). With regard to the specific claim of unlawful arrest (Count Two), Black has presented evidence that Martin was jealous of his relationship with Deidra, sent a Facebook message "wishing bad things" on him, and told Hunt that he would make sure Black went to jail. Based on these facts, a reasonable jury could find that Martin arrested Black in bad faith. Furthermore, as discussed above, the events giving rise to Black's arrest which are relevant to the determination of probable cause are in dispute.

The same can be said Black's claim of assault and excessive force. The

facts as alleged by Black create a genuine issue of material fact as to whether Martin's use of force was "so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith." See Ex parte City of Tuskegee, 932 So.2d 895, 904 (Ala. 2005); see also Ex parte City of Gadsden, 781 So.2d 936, 938 (Ala. 2000). As set forth above, the same reasons that lead this court to deny federal qualified immunity to Martin – that Martin kicked Black in the head while Black was subdued, handcuffed and face-down on the ground; Black was no longer a threat to the safety of others; and the force was no longer needed to effectuate an arrest – these factors, alleged by Black and construed as true for purposes of summary judgment, could lead a reasonable jury to find that Martin's use of force was, willful malicious or engaged in bad faith.

Accordingly, Martin's motion for summary judgment is **DENIED** as to Martin in his individual capacity as to the state law claims.

### 2. State law claims against Chief Williams

Black has not cited any case law demonstrating that there is a viable cause of action for Chief Williams for the failure to train, supervise or monitor a subordinate. Chief Williams also asserts he is entitled to discretionary-function immunity under Ala. Code § 6-5-338. Chief Williams was engaged in a discretionary function within the line of scope of his law enforcement duties as chief in supervising the officers in the police

department. Black does not allege that Chief Williams participated in his arrest. Chief Williams was not present at the scene of the incident on May 22, 2010, and did not respond to the scene. Chief Williams did not personally know of any complaints made against Martin. Furthermore, these isolated complaints do not constitute repeated acts of alleged incompetence on the part of Martin such that Chief Williams should have been aware that Martin would assault or wrongfully arrest Black. Black has not shown any evidence that Chief Williams acted in bad faith sufficient to defeat qualified immunity. Thus, summary judgment is due to be **GRANTED** as to the state law claims against Chief Williams.

### 3. State law claims against the City of Mobile

The City of Mobile argues that they are entitled to immunity. "[U]nder principles of vicarious liability, where a municipal employee enjoys immunity, the municipality likewise is immune as to the claims based on the employee's conduct." City of Bayou La Batre v. Robinson, 785 So.2d 1128, 1131 (Ala. 2000). When the "municipal employee" is a law enforcement officer, Alabama's statutory, discretionary-function immunity extends the officer's immunity to the employing municipality. Ala. Code §6-5-338(b) ("This section is intended to extend immunity only to police officers and governmental units or agencies authorized to appoint peace officers."). Martin was clearly performing a discretionary function within the line and scope of

his employment when arresting Black. However, he is not entitled to statutory discretionary function immunity as to the assault claim because Black presented evidence supporting the conclusion that Martin may have acted in bad faith. Because Martin is not entitled to immunity for the unlawful arrest claim, § 6-5-338(b) does not extend the immunity to the City of Mobile.

In the alternative, the City of Mobile relies on Ala. Code § 11-47-190 (1975) which "provides an action against a municipality for the 'neglect, carelessness or unskillfulness' of its agents, not for their intentional torts." Franklin v. City of Hunstville, 670 So.2d 848 (Ala. 1995); See Ex parte City of Gadsden, 718 So.2d 716, 721 (Ala. 1998) ("Section 11-47-190…absolves a city from liability for an intentional tort committed by one its agents…"). In this case, Black's testimony used to support his assault claim indicated that the Martin intentionally kicked him in the head while he was handcuffed, facedown on the ground. Because Martin's alleged conduct of kicking Black in the head was intentional, the City is entitled to immunity as to the assault claim.

Black also asserts a claim for the failure to monitor, supervise and train under Alabama state law. Pursuant to Ala. Code. § 11-47-190 and applicable Alabama case law, there can be no state law claim for negligent training or supervision against the City of Mobile. Ott v. City of Mobile, 169 F.Supp.2d 1301, 1314-115 (S.D. Ala. 2001). Furthermore, because Chief

Williams is entitled to discretionary-function qualified immunity for the failure to train, supervise or monitor a subordinate under § 6-5-338, the City of Mobile is entitled to qualified immunity as well. Thus, summary judgment is due to be **GRANTED** in favor of the City of Mobile on all state law claims.

## IV. CONCLUSION

For the foregoing reasons, the defendants Chief Williams' and the City of Mobile's motion for summary judgment (Doc. 39) is **GRANTED** and defendant Martin's motion for summary judgment (Doc. 43), is **DENIED**.

**DONE and ORDERED** this 5th day of August, 2013.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE